RANDY S. GROSSMAN
United States Attorney
DANIEL E. ZIPP
Assistant United States Attorney
California Bar No. 262118
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Tel: (619) 546-8463
Email: Daniel.Zipp@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 14-CR-2253-DMS |
|---|---|
| Plaintiff, | Date: October 7, 2022 |
| v. | Time: 9:00 a.m. |
| JUAN MANUEL ALVAREZ-INZUNZA, | **SENTENCING MEMORANDUM** |
| Defendant. | |

## INTRODUCTION

Juan Manuel Alvarez-Inzunza was extradited to the United States from Mexico, in 2021, as the lead defendant in a long-running wiretap investigation into the money laundering activities of the Sinaloa cartel. Over the course of several years, the United States intercepted thousands of blackberry messages in which Alvarez-Inzunza organized the transfer millions of dollars in drug proceeds out of the United States to Mexico and Colombia at the request of the leadership of cartel. Agents used these intercepted messages to seize at least $3.5 million in bulk currency before it left the country, and other intercepts showed Alvarez-Inzunza orchestrating the transfer of millions more. This Court should impose the statutory maximum sentence of 240 months' custody.

## STATEMENT OF FACTS

In July 2013, agents began a Title III wiretap investigation into several individuals who appeared to be orchestrating the transfer of bulk currency out of the United States. Over the course of two years, agents intercepted dozens of blackberry devices, and eventually worked their way up to Alvarez-Inzunza. As outlined below, intercepts revealed that Alvarez-Inzunza coordinated the transfer of millions of dollars in drug proceeds out of the United States, and he directed some of those proceeds to be used to fund additional cocaine shipments intended to for the United States.

### A. Money Laundering Activities

Intercepts revealed a clear pattern to the money laundering activities of Alvarez-Inzunza. First, he received a solicitation—from high-level members of the Sinaloa cartel—to pick up money at various locations in the United States. These associates would provide Alvarez-Inzunza with a U.S. cellphone number and code word. Alvarez-Inzunza would then reach out to one of several associates in Colombia, including Ivan Alfredo Castro Santana (D3).[1] These Colombian associates would then arrange for a lower-level courier in the United States to contact the number and make the requested pick-up. Interception of these messages led to more than a dozen bulk currency seizures in the United States. Several examples are outlined below.

#### 1. Seizure of $250,000 in New York

In December 2013, Alvarez-Inzunza received a request from an individual with the blackberry username JLS for assistance picking-up currency in New York. Once Alvarez-Inzunza agreed, JLS provided him with a telephone number and code word:

JLS:    So you can pick up at the towers [New York]?

[A-I]:   How much?

---

[1] Castro Santana was extradited from Colombia in 2016. He pled guilty to one count of conspiracy to launder monetary instruments and this Court sentenced him to 97 months' custody in 2017. ECF 351.

| | | |
|---|---|---|
| JLS: | | 150 [thousand USD] |
| [A-I]: | | Yes but it's going to get paid [in Mexico] after Christmas before New Year's around those days. Cause the people from over there is starting to arrive. |
| | | . . . |
| JLS: | | I will tell you right now.  Should I give you the number? |
| [A-I]: | | Give it to me. |
| JLS: | | 215-800-7369 and have them ask for Melisa's auto shop.  Its 150 thousand USD. |

After the exchange above, Alvarez-Inzunza immediately sent a message to Castro-Santana in Colombia asking him how quickly he could transfer funds out of New York.  When Castro-Santana responded 3-4 days maximum, Alvarez-Inzunza forwarded him the number "215-800-7369" and told him to "ask for Melisa's auto shop."  Castro-Santana then passed that number and code on to other subcontractors, to perform the pick-up.  Before the money could be delivered, however, agents located the cellphone, executed a traffic stop, and seized $150,000 in cash. A subsequent consensual search of the courier's residence revealed an additional $100,000 in cash.

At the same time that agents were seizing the currency, Alvarez-Inzunza and Castro Santana discussed their attempts to complete the currency pick-up. On December 6, 2013, Castro Santana sent Alvarez-Inzunza a message stating "My lord, do you have any word from the people at the auto shop?"  The next day, Alvarez-Inzunza informed Castro Santana that "it got busted."  He asked Castro Santana for the precise details of what happened to his courier, so "we can clarify to them that it was on their side and we didn't receive it."  Alvarez-Inzunza also exchanged messages with JLS to assign blame about the lost load:

| | | |
|---|---|---|
| JLS: | | The guy of the 150 from yesterday with you. |

| | | |
|---|---|---|
| [A-I]: | | He didn't deliver [the bulk currency]. |
| JLS: | | you see I was telling you there were some dudes calling them that I asked you who they were. |
| [A-I]: | | Yes. |
| JLS: | | Supposedly, they were cops [calling] and they [couriers] got busted. |
| [A-I]: | | They left the dude [currency recipient] sitting at the restaurant. The same guy [recipient] received [currency] from another person. With 100 [thousand USD]. Because they didn't busted the other dude. |

2. <u>Seizure of $225,000 in New York</u>

In February 2014, monitors intercepted a message from Alvarez-Inzunza to Castro Santana in which he provided a number for another pick-up in New York. DEA agents in New York located the phone and conducted surveillance on the user. Agents observed the user of the phone walking on the street with a heavy bag. They stopped him, received consent to search the bag, and discovered approximately $225,000 in currency. Afterwards, they received consent to search the courier's apartment where they discovered small amounts of cocaine and heroin, drug processing equipment, and a loaded .40 caliber semi-automatic pistol.

3. <u>Seizure of $200,000 in Boston</u>

In February 2014, Alvarez-Inzunza received another request from an individual with username CHE, to pick up currency in Boston:

| | | |
|---|---|---|
| [A-I]: | | Boss, how much [money] do you have in Boston? |
| CHE: | | 122 [thousand USD] buddy. So let me know [about the pickup] so I can tell the crazy guys. |
| [A-I]: | | Yes in short. |

- 4 -

| | | |
|---|---|---|
| CHE: | | Ok thank you. |
| [A-I]: | | 9/5 [percent transmission fee] from Boston. |

After the exchange above, Alvarez-Inzunza immediately contacted Castro Santana, and asked if "there is a way to pick up something in Boston." Castro Santana agreed, and Alvarez-Inzunza provided him a phone number and said, "it's a total of 238,500." On February 18, 2014, Alvarez-Inzunza informed Castro Santana that "the guys from Boston, already got the appointment" to pick-up currency. Over the next two days, Alvarez-Inzunza, CHE, and Castro Santana exchanged numerous messages in which they expressed frustration that their couriers were not answering phone calls.

Meanwhile, agents in Boston were able to locate the cellphone, conduct surveillance, and execute a traffic stop of the courier delivering the currency. Inside the vehicle, officers discovered a total of $200,000 in cash in a suitcase. Immediately afterwards, Alvarez-Inzunza sent a message to CHE informing him of the seizure:

| | | |
|---|---|---|
| [A-I]: | | Boss. They are telling me that they were waiting for the person at the appointment. And that he called and said that they had stopped him. And cut off communication. |
| CHE: | | Let me see. |
| CHE: | | What a mess. They tell me that they were waiting to meet the "person". And that he called and said that they had stopped him. |

4.   <u>Seizure of $400,000 in Detroit, MI</u>

In May 2014, monitors intercepted a series of messages in which an individual with the blackberry username MUDO requested the assistance of Alvarez-Inzunza to pick up $150,000 in Detroit, Michigan. MUDO provided Alvarez-Inzunza with a telephone number and code word and confirmed that the total would be "150 to 200." Alvarez-Inzunza explained that it would take "15 days in the fastest" to move the

money to Culiacan, and it would be paid out in "dlls" not "pesos." After Alvarez-Inzunza agreed to the pick-up, monitors intercepted a series of exchanges in which he passed the information to Castro Santana. From there, the phone number was passed down to other subcontractors in Colombia and $150,000 was eventually picked up in Detroit and transferred to Colombia.

After the initial pick-up of $150,000, MUDO informed Alvarez-Inzunza that "the one with the money told me they have more." Alvarez-Inzunza asked for a total, and MUDO responded "600" with "300 handy." The two made plans to coordinate a second pick-up of $150,000 the next morning. Alvarez-Inzunza then contacted Castro Santana, to urge him to complete an "inventory" [count] of the first pick-up, so that he could get started picking up the "other one."

MUDO then provided Alvarez-Inzunza with a telephone number and code for the second pick-up. Alvarez-Inzunza immediately passed the information to Castro Santana, who passed it on to a subcontractor. Meanwhile, agents in Detroit identified the rental cars used by the couriers in the first $150,000 pickup. On May 8, 2014, agents and local officers conducted a traffic stop on one of the couriers (ostensibly for talking on the phone while driving) and seized $48,900. They also obtained a search warrant on both couriers' hotel rooms at a local casino. In total, they recovered $390,000 from the vehicles and hotels. Meanwhile, Alvarez-Inzunza contacted Castro Santana to find out what was happening:

[A-I]:      They keep calling but no answer. The one in Dt [Detroit].

MUDO:      Tell them. That he [courier] already returned. He was driving and they caught him talking over the phone.

[A-I]:      Well, they have been calling him [courier] since the morning as you instructed to call before noon. Have him proceed then.

| | | |
|---|---|---|
| MUDO: | | Well, have them not call him [courier] anymore because the idiot was talking and driving and they pulled him over and he had like 30 bucks with him. And they took [seized] the money from him and he got rid of the cell and took off. haha, the guy was scared but everything is good. |

5. <u>Other transfers</u>

In addition to the examples above, agents also intercepted several other large currency loads as a result of intercepts of Castro Santana's blackberry. Other intercepts revealed successful currency deliveries orchestrated by Alvarez-Inzunza that agents were unable to stop. In one telling series of exchanges between Alvarez-Inzunza and Castro Santana, Castro Santana provided a complete breakdown of the currency transfers he coordinated in a single month between the United States and Panama and Guatemala.

| | | |
|---|---|---|
| [A-I]: | | Boss by any chance do you happen to have the accounts [transmissions] from the day before February 15, where you have the total amount of 140870 [USD] that day[?] |
| [Castro]: | | Let me check it sir. |
| [A-I]: | | Yes, it's because I'm going over the number with a customer and I'm tied up with a delivery. |
| [Castro]: | | Balance from January 20: 258,990. Receipts: 100 in Ch [Chicago] on January 21 is 96,000 [after subtracting a suspected 4% commission]. 56,900 in Ch [Chicago] on January 22 is 54,624. 103,000 in TT [New York] on January 27 is 98,880. 140,000 in TT [New York] on February 6 is 134,400. Total receipts: 383,904. |
| | | Deliveries: 102,000 in Gtm [Guatemala] on January 30. 159,600 in Pan [Panama] on February 6. 243,270 |

in Gtm [Guatemala] on January 12. Total deliveries: 504,870.

Total 258,990 [starting balance] + 383,904 [total receipts] = 642,894. 642,894 - 504,870 [total deliveries] = 138,024 + 2,850 = Total of 140,874.

Castro Santana also sent summary messages to Alvarez-Inzunza reflecting similar amounts of transfers on October 15, 2013, March 20, 2014, April 5, 2014, and May 10, 2014.

      B.      <u>Knowledge of Drug Proceeds</u>

In addition to the money laundering intercepts summarized above, monitors also intercepted thousands of electronic messages showing Alvarez-Inzunza knew the funds were drug proceeds and were being used to fund additional loads of narcotics. In one exchange, from February 2014, one of Alvarez-Inzunza's associates was intercepted offering a supplier that he had "enough [money] to buy a ton [of narcotics]" in Panama. The associate then reached out to Alvarez-Inzunza and asked "What's the word. I have 80 [narcotics units] in Panama. If you can put that money in Colombia for me. And how much will you charge me, sir." Alvarez-Inzunza responded "Yes boss it can be done," and then arranged for the money to be transferred through Mexico. Over the next few months, Alvarez-Inzunza and his associate discussed the price of cocaine in Panama ($5800 per kilo) and the number of units they could purchase with the money they had available there.

In early May 2014, monitors intercepted messages from Castro Santana, Alvarez-Inzunza, and several others, in which they discussed purchasing 50 kilograms of cocaine in Panama for $5200 per kilogram. Alvarez-Inzunza agreed to oversee the payment of funds in Panama. He also communicated directly with the individual in Panama who was responsible for accepting the delivery of cocaine.

After several days of messages arranging the delivery, Castro Santana notified an associate that "the whole situation came crashing down." Contemporaneous messages suggest that the courier made payment for the cocaine, but his car was stolen,

and he never received the cocaine in return. Afterwards, monitors intercepted messages from Alvarez-Inzunza in which he discussed the lost money and stated that "they are going to hang me over here." Castro Santana likewise complained "they are going to end up killing me for that [lost money.]" Panamanian officials stopped the courier responsible for the pick-up as he attempted to leave the country at the airport. He admitted that he had delivered a load of bulk currency and said he feared for his life.

In addition to the lost load in Panama, agents intercepted numerous other exchanges in which Alvarez-Inzunza appeared to coordinate in the purchase of cocaine in Panama and Costa Rica. For instance, in May 2014 he asked to confirm that he would "have that [drugs] ready tomorrow in Costa [Rica]." Castro Santa confirmed and added "the one from Pan[ama] should arrive this weekend." When Alvarez-Inzunza asked about the price, Castro Santana responded "the price is the least of worries. He sells it for whatever it goes for on the street."

In addition, other intercepts showed Alvarez-Inzunza actively involved in coordinating the importation of narcotics from Mexico into the United States. For instance, on March 28, Alvarez-Inzunza discussed moving 12 units across the border with an associate with the username YAYO. He later informed YAYO that he had six narcotics units, which he was trying to sell for $18,200. YAYO responded that he would reach out to a third party to find out if he would buy them. The next month, YAYO, Alvarez-Inzunza, and another associate all discussed the transportation of a load of narcotics into the United States. YAYO then passed bank account information to Alvarez-Inzunza, in order to transfer payment for the drugs. After these exchanges, agents began intercepting the blackberry of YAYO, which led to the seizure of several loads of narcotics, including 8.75 kilograms of methamphetamine at the Otay Mesa Port of Entry and 16 kilograms of methamphetamine in Los Angeles.

## SENTENCING RECOMMENDATION

The United States recommends the court impose a sentence of 240 months in custody. As outlined below, there are a number of guidelines adjustments that give Alvarez-Inzunza a total offense level of 37, with a guideline range of 210 to 262 months and the §3553(a) factors fully support a sentence within that range.

### A.  Amount of Money Laundered

Alvarez-Inzunza admitted in his plea agreement that he arranged for the transfer of more than $3.5 million in illicit funds. This number is fully supported by the wire intercepts, which showed Alvarez-Inzunza coordinating the transfer of hundreds of thousands dollars at a time, on a weekly basis, from multiple cities in the United States. It is also supported by the amount of bulk currency actually *seized*, which conspiracy-wide totaled over $4 million. This results in an 18-level increase in the guidelines under USSG §2B1.1(b)(1).

### B.  Knowledge of Drug Proceeds

The United States also recommends a six-level increase for knowledge of drug proceeds under §2S1.1(b)(1). As outlined above, numerous intercepted exchanges show that Alvarez-Inzunza was actively involved in the negotiation of drug purchases, and he transferred funds to various international locations specifically to finance those purchases. Although no seized loads of narcotics in the United States are directly tied to Alvarez-Inzunza, the evidence is clear that Alvarez-Inzunza was fully aware of the source of the funds he was moving, and what those funds were being used to purchase.

### C.  Business of Laundering Funds

The United States recommends a four-level increase since Alvarez-Inzunza was "in the business of laundering funds." As outlined above, intercepted messages showed Alvarez-Inzunza coordinating with others to pick-up currency on a weekly basis in cities around the country. He also had a number of associates in Colombia, whom he used to arrange transfers, and the intercepts revealed additional layers of sub-contractors and couriers, all of whom worked together to effectuate transfer on behalf

of the cartel. Alvarez-Inzunza often discussed the amount of commission he would charge for each transfer and sent summaries of his monthly totals to his associates. By all accounts the transfer of drug proceeds appeared to be Alvarez-Inzunza's full-time job.

### D. Aggravated Role

Section §3B1.1(a) provides for a four-level increase if a defendant was the "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." §3B1.1(a). Alvarez-Inzunza easily fits that definition. Intercepts showed Alvarez-Inzunza to be at the top of a money laundering conspiracy that operated with layers of lower-level associates, subcontractors, and couriers, spread across multiple countries. Alvarez-Inzunza directed others in Colombia, Panama, Costa Rica and Mexico to coordinate the transfer of funds to facilitate drug purchases. He also worked with some of the highest-level members of the Sinaloa Cartel including close associates of Ismael "El Mayo" Zambada and Joaquin "Chapo" Guzman. Indeed, during one exchange, immediately after the arrest of Guzman, Alvarez-Inzunza discussed the arrest with one of his associates and openly fretted about whom he should align himself within in the cartel going forward now that Chapo was in custody.

[A-I]:   I don't know where to go. If over by the INGES. The Mayos [Ismael "El Mayo" ZAMBADA]. The Chapos [Joaquin "CHAPO" GUZMAN]. The MENCHOS [Nemesio Oseguera RAMOS aka EL MENCHO]. Mister Neto GUZMAN sent me a message.

YAYO:   Really? What did he tell you? Did the bomb explode or what? Well, go over there you already know. Over to gdl [Guadalajara, MX]. Because there isn't going to be a cartel there in cln [Culiacan, MX], only war. What did they tell you? Im dying to know? Let me know so I won't go back there anymore. Hahaha and ask for a flag of Inge and that's it.

In short, Alvarez-Inzunza operated at the highest levels of the cartel, and he directed a network of lower-level associates to facilitate the transfer of millions of dollars on the cartel's behalf. A four-level increase for aggravated role is fully justified.

### D. 18 U.S.C. 3553 Factors

Finally, the § 3553 factors support a mid-range sentence of 240 months. Although the United States has little information about the history and characteristics of Alvarez-Inzunza—as he has spent his life in Culiacan, Mexico and only came to the United States after extradited—the nature and circumstances of his offense are uniquely aggravated. As outlined above, Alvarez-Inzunza was the leader of a sprawling, international criminal organization responsible for transporting millions of dollars in drug proceeds out of the United States. As a direct result of the conspiracy in this case, law enforcement officials seized more than $4 million in drug proceeds and the intercepts show that Alvarez-Inzunza was the regular transfer of comparable amounts on a regular basis for years before his arrest. Other intercepts also reveal that Alvarez-Inzunza was directly engaged in negotiating the purchase of bulk quantities of cocaine and directed the transfer of drug proceeds to fund those purchases. Given the amount of money and narcotics involved, and given Alvarez-Inzunza's position in the cartel, a mid-range sentence of 240 months is sufficient but not greater than necessary to provide adequate deterrence, reflect the seriousness of the offense, and provide just punishment.

## CONCLUSION

The Court should impose a sentence of 240 months' custody.

DATED: September 30, 2022					Respectfully submitted,

						RANDY S. GROSSMAN
						United States Attorney

						*/s/Daniel E. Zipp*
						DANIEL E. ZIPP
						Assistant U.S. Attorney